IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO,

and

IAMAW DISTRICT LODGE 141,

Plaintiffs,

v.

UNITED AIRLINES, INC.,

Defendant.

Case No. 1:20-cv-02045

**COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

1. This lawsuit is brought to enforce binding commitments made by United Airlines to the United States government and to its own employees to maintain wages and benefits during the coronavirus pandemic, and to prevent United Airlines from acting to abrogate its collective bargaining agreements with Plaintiffs.

2. In April 2020, United Airlines accepted *five billion dollars* of public funds in exchange for its contractual promise to "refrain from conducting involuntary layoffs or furloughs, or reducing pay rates and benefits, of employees … until September 30, 2020." Less than two weeks later, however, after repeated attempts to induce voluntary leaves of absences and reductions in pay, United declared that it intended to unilaterally slash the pay and benefits of approximately 27,000 of its Passenger Service and Fleet Service employees by forcing them all into part-time positions. This unprecedented move will cut the pay of most of these

employees by at least 25%, cause furloughs, and reduce their benefits, all in violation of United's contractual promise to the U.S. Treasury Department in exchange for receipt of taxpayer funds. It is also contrary to the express language of the relevant collective bargaining agreements.

3. Plaintiff the International Association of Machinists and Aerospace Workers, AFL-CIO is the largest union in the airline industry and is the certified collective bargaining representative of the impacted United Airlines employees, and it carries out this representational function through its affiliate, Plaintiff District Lodge 141. Plaintiffs, referred to collectively herein as "the IAM", bring this action to enforce, as third-party beneficiaries, United's contractual obligations to preserve existing jobs, pay and benefits of its employees. In addition, and independently, the IAM seeks to enforce the status quo provisions of the Railway Labor Act and the unambiguous contractual obligation of United to maintain both a full-time and a part-time workforce.

## THE PARTIES

4. The International Association of Machinists and Aerospace Workers, AFL-CIO, is an international labor organization representing over 500,000 employees active and retired employees in North America approximately 100,000 of which are employed by airlines. The IAM is the largest union in the airline industry and is the certified collective bargaining representative of the approximately 27,000 Fleet Service Employees and Passenger Service Employees of United Airlines, Inc.

5. IAMAW District Lodge 141 is an affiliate of the International, and it has responsibility for negotiating and enforcing the Fleet and Passenger Service collective bargaining agreements at United, among other things.

6. United Airlines, Inc. is a carrier by air subject with headquarters in Illinois. United conducts business in and is subject to personal jurisdiction within this judicial district.

JURISDICTION

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

FACTS

8. In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136 ("CARES Act''). Among other things, the CARES Act provides for federal loans, loan guarantees, and financial assistance payable to eligible air carriers.

9. Subtitle B of the CARES Act, entitled "Air Carrier Worker Support" is specifically designed to provide "relief for aviation worker" by "preserv[ing] aviation jobs and compensate[ing] air carrier industry workers." § 4112(a). Under Subtitle B, airlines such as United may apply for and receive "payroll support" funding. Funds under this Subtitle "shall exclusively be used for the continuation of payment of employee wages, salaries, and benefits." *Ibid.* Funding is specifically conditioned on an agreement between the air carrier and the Treasury Department to, among other things, "refrain from conducting involuntary furloughs or reducing pay rates and benefits until September 30, 2020". § 4114(a)(1).

10. Guidelines issued by the U.S. Treasury Department mandated "to be eligible to receive payments, an applicant must agree to:

- use such payments exclusively for the continuation of employee wages, salaries, and benefits; [and]
- refrain from conducting involuntary layoffs or furloughs, or reducing pay rates and benefits, of employees of the applicant"

11. On April 15, 2020, United Airlines announced that it had applied for and expected to receive $5 billion from the CARES Act program. United issued a press release announcing

that "These funds secured from the U.S. Treasury Department will be used to pay for the salaries and benefits of tens of thousands of United Airlines employees. …. 'We thank Congress and the Administration for quickly passing legislation to protect the paychecks of tens of thousands of United Airlines employees.'"

12. United's application for CARES funding was required to include, and on information and belief did include, actual payroll and benefits information from 2019. Such information reflected staffing of both full-time and part-time Passenger Service and Fleet Service employees at the time and was not based on a purely part-time staff.

13. On April 20, 2020, United entered into a contract known as the Payroll Support Program Agreement ("PSP Agreement") with the U.S. Treasury Department, in which it expressly obligated itself to refrain from conducting involuntary layoffs or furloughs, or reducing pay rates and benefits, of its employees.

14. The PSP Agreement was the product of direct negotiations between United and the Treasury Department which established its terms.

15. Pursuant to this Agreement, United has received an initial payment of nearly $2.5 billion in financial assistance specifically designated for employee payroll support, with additional payments to follow. United is also receiving an additional $1.5 million in a low-interest rate loan under one or more separate agreements.

16. The PSP Agreement contains United's binding agreement that it "shall not conduct an Involuntary … Furlough of any Employee between the date of this Agreement and September 30, 2020"; that in this same time period it "shall not … reduce, without the Employee's consent, …the pay rate of any Employee earning wages", nor "reduce … the Benefits of any Employee." A "furlough" is defined by the PSP Agreement as including

"requiring one or more Employees to take a temporary suspension or unpaid leave for any reason, including a … slow-down of business."

17. United Airlines' employees are intended beneficiaries of the PSP Agreement. Indeed, the primary purpose of the PSP Agreement is to provide funding for employees and to prevent furloughs and reductions in either pay or benefits. All of the funds payable to United under the PSP Agreement must be used for "the continuation of payment of Wages, Salaries, and Benefits to the Employees of the Recipient."

18. The PSP Agreement does not itself purport to amend any collective bargaining agreements, and specifically provides that it is not conditioned on United's "implementation of measures to enter into negotiations with the collective bargaining representatives of a craft or lass of employees ... regarding pay or other terms and conditions of employment."

19. The IAM and United signed the current collective bargaining agreements on April 18, 2016 and they are not subject to amendment until December 31, 2021. The duration provision of both the Fleet Service and Passenger Service Agreements provides as follows:

> The provisions of this Agreement will become effective on April 18, 2016 (the "Effective Date") except as otherwise specifically stated in the Agreement. B. Amendable Date This Agreement will continue in full force and effect through and including December 31, 2021 and will thereafter renew itself without change each succeeding January 1, unless written notice of intended change is served in accordance with Section 6, Title I, of the Railway Labor Act, as amended (the "Act") by either party no earlier than 18 months prior to December 31, 2021 or any December 31 thereafter.

20. The Agreements provide for an "issue resolution" process to address matters that may arise during their terms, but specifically prohibit any substantive changes in the basic terms of the Agreement without the IAM's consent. Letter of Agreement Number 1 to both Agreements provides as follows:

> To further the working relationships established, United and the IAM agree to engage in an issue resolution process, as appropriate and necessary, to address matters that may arise under the agreements. The parties agree that such process is not intended to provide for substantive changes in the basic terms and conditions of the agreements, except as may be mutually agreed, and that such process will not be covered by or conducted pursuant to Section 6 of the RLA or be deemed a waiver of the parties' agreement in Article 11.

21. Both the Fleet Service and Passenger Service Employee Agreements between the IAM and United forbid the elimination of all full-time positions.

22. No provision of either Agreement states that United may operate with an entirely part-time workforce, and Article 4.A.7.a of each Agreement specifically forbids United from displacing full-time work with part-time work: "Back-to-back part-time shifts will not be used to cover staffing needs that could otherwise be covered by a single full-time shift."

23. In addition, Letter of Agreement # 5 to the Fleet Service Agreement states that "United has agreed that no full-time employee active in the Fleet Service … workgroup[] as of execution of these agreements will be involuntarily reduced as a direct result of the Company's ability to schedule shift start-times in accordance with Article 4.A.7.a, or to employ part-time Lead Ramp Servicemen."

24. At no point in any collective bargaining negotiations leading up to the current collective bargaining agreements did the parties discuss, much less agree to, the possibility of having a purely part-time work force under any circumstance. To the contrary, both Agreements expressly call for a combination of predominately full-time employees with a much smaller contingent of part-time employees.

25. Prior to receipt of the $5 billion in CARES Act funding, United advised the IAM that if funding was denied, it would be required to take drastic cost cutting measures involving IAM-represented employees. One such measure was to "reduce" all of its fleet and passenger

service employees to a part-time status. During these discussions, United conceded that it did not have authority under the collective bargaining agreement to make this change without the union's consent. Despite then receiving the CARES funding and committing itself to maintain "pay rates and benefits" of its employees, United on May 1, 2020 announced that it would proceed with this same plan.

26. On May 1, 2020, United advised the IAM that "effective May 24, 2020 … all full-time employees covered by the Passenger Service Employees Agreement and the Fleet Service Employees Agreement will be reduced to part-time status." Untied contended that this action was "in full compliance with … the CARES Act," apparently because, in its view, it was not reducing "pay rates."

27. While the effective date of this mass reduction is May 24, 2020, United has given affected employees only until May 13, 2020 to make an "irrevocable decision" whether to accept a reduction to part-time status; retire with no recall rights; separate from employment with no recall rights; or elect furlough with furlough pay and a right of recall. United has directed that "Once you make your election … it is irrevocable, and you cannot change it."

28. United's scheme to unilaterally "reduce" all employees to a part-time status will reduce their pay rates and benefits. Pay rates will be reduced because employees who had been paid for a 40-hour week would now be paid only for a 30-hour week. Pay will thus be reduced by at least 25%.

29. United's decision will reduce the pay of all of its current full-time Fleet and Passenger Service Employees by at least 25%. These employees currently work and are paid on a 40-hour full-time schedule, and they will be reduced to a 30-hour part-time schedule, with a concomitant reduction in pay. In addition, United's action will also reduce the pay rates of

employees who currently work as full-time "Leads", for which they receive an hourly pay premium. The announced elimination of all full-time jobs will eliminate the full-time "lead" positions and cut the hourly pay rate of each Fleet and Passenger Service Employee who currently works as a Lead. The IAM estimates that while all of its members at United will suffer pay loss because of the reduction in hours, between 3000 and 4000 employees will be adversely affected by actual cuts in their pay rates.

30. United's decision will also reduce the benefits of its Fleet and Passenger Service Employees. Under both Agreements, employees accrue paid vacation, paid sick leave, and paid occupational leave based on each hour that they work. By reducing employee hours by 25%, these benefits will all be reduced by the same proportion.

31. United's decision will reduce the furlough pay benefit to which employees are entitled. Under Article 7.J of both Agreements, full-time employees are entitled to greater furlough pay than are part-time employees. Full-time employees are entitled to pay based on their years of service, for a minimum of two weeks (for employees with more than one year of service) to a maximum of 17 weeks (for employees with 15 or more years of service). This pay is then calculated based on the employee's hourly rate of pay at the time of layoff. Part-time employees, in contrast, "receive[] furlough pay based on the average of his or her schedule hours during the 2 pay periods prior to the layoff." Thus, a 15-year full-time employee will lose over 15 weeks of furlough pay if he is reduced to part-time and later furloughed.

32. United's decision will also reduce the retirement benefits to at least some of its employees. Employees who formerly worked for Continental Airlines participate in retirement plan known as the "CARP", and benefits under that plan are based on the employee's pre-

retirement income. The reduced income caused by United's plan will carry over into a reduced retirement benefit under CARP.

33. A similar benefit reduction will impact employees who have life insurance which is available under the collective bargaining agreements. Both agreements provide an option for life insurance coverage which pays a benefit based on a multiple of the employee's income. Cuts in pay will reduce the potential life insurance benefit for each such employee.

34. Benefits which are calculated based on annual compensation, including life insurance and long-term disability insurance, will also be reduced or terminated. In addition, medical benefits will be reduced because employees will have to pay a substantially greater proportion of their income to be able to continue their medical benefits.

35. United's decision will also cause furloughs. Full-time employees are being furloughed from their full-time positions and forced to bid for part-time positions. Full-time lead employees are having their positions eliminated as well. United's plan does violence to the purpose and intent of the PSP Agreement.

## CAUSES OF ACTION

## **COUNT ONE**

## BREACH OF CONTRACT (FEDERAL COMMON LAW)

36. Paragraphs 1-35 are incorporated as if restated herein.

37. The PSP Agreement is a binding contract between United Airlines and the Department of the Treasury, which by its terms is governed by Federal law.

38. United's Fleet Service and Passenger Service Employees, represented by the IAM, are intended third party beneficiaries of the PSP Agreement under federal common law.

39. United's decision to reduce all Fleet and Passenger Service Employees to part-time status violates paragraphs 4.a and 4.b of the PSP Agreement.

40. United's decision will cause irreparable injury to Fleet Service and Passenger Service Employees who will be required to make irrevocable decisions regarding their job status by May 13, 2020, and who will lose benefits for which no subsequent compensation will be sufficient.

## COUNT TWO

BREACH OF CONTRACT
(NEW YORK LAW)

41. Paragraphs 1-40 are incorporated as if restated herein.

42. The PSP Agreement is a binding contract between United Airlines and the Department of the Treasury, which by its terms is governed by Federal law. The Agreement provides, however, that if there is no applicable Federal law, it shall be construed in accordance with the laws of the State of York.

43. United's Fleet Service and Passenger Service Employees, represented by the IAM, are intended third party beneficiaries of the PSP Agreement under the laws of the State of New York.

44. United's decision to reduce all Fleet and Passenger Service Employees to part-time status violates paragraphs 4.a and 4.b of the PSP Agreement.

45. United's decision will cause irreparable injury to Fleet Service and Passenger Service Employees who will be required to make irrevocable decisions regarding their job status by May 13, 2020, and who will lose benefits for which no subsequent compensation will be sufficient.

**COUNT THREE**

(RAILWAY LABOR ACT)

46. Paragraphs 1-45 are incorporated as if restated herein.

47. The Railway Labor Act establishes elaborate machinery for the negotiation, mediation, and conciliation of collective bargaining agreements. Central to this machinery are the RLA's "status quo" requirements, which impose upon parties the obligation to refrain from altering the rates of pay, rules and working conditions, including working hours, in effect pending negotiation under and exhaustion of the RLA's remedies.

48. The parties are in a dispute subject to Section 6 of the Railway Labor Act over unilateral changes to their collective bargaining agreements covering Fleet Service and Passenger Service employees. This is a "major dispute" under the RLA.

49. Section 2, First of the Railway Labor Act, 45 U.S.C. § 152, which is applicable to common carriers by air pursuant to Title II of the Act, 45 U.S.C. § 181, requires that carriers, including their officers, employees and agents, "exert every reasonable effort to make and maintain agreements."

50. Section 2, Seventh, of the RLA, 45 U.S.C. § 152, mandates that "[n]o carrier, its officers, or agents shall change the rates of pay, rules or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in Section 156 of this [Act]."

51. Section 6 of the RLA, 45 U.S.C. § 156, which is applicable to common carriers by air pursuant to Title II of the Act, 45 U.S.C. § 181, mandates that "rates of pay, rules or working conditions shall not be altered by the carrier" until exhaustion of various stages of the collective bargaining process under the RLA.

52. Section 6 thus forbids United Airlines from changing the wages, benefits and working conditions of its IAM-represented employees covered by collective bargaining agreements without first negotiating such changes in the manner require by that Act.

53. United's intended elimination of all full-time Fleet and Passenger Service Employee work, contrary to the unambiguous language of those Agreements, and the settled practice of the parties, is a unilateral change in wages, benefits and working conditions which is contrary to the Railway Labor Act.

## PRAYER FOR RELIEF

WHEREFORE, the IAM respectfully requests that the Court enter judgment in its favor and also award the following relief:

A. A Temporary Restraining Order barring United Airlines from requiring IAM-represented employees to make an irrevocable choice regarding part-time status, retirement, separation, or furlough, by the May 13, 2020 deadline it has established;

B. A Preliminary Injunction barring United Airlines from implementing its proposed mass reduction of all Fleet and Passenger Service Employees to part-time status pending final adjudication on the merits;

C. Injunctive relief barring any involuntary furlough of IAM-represented employees by United until no earlier than September 30, 2020;

D. Injunctive relief barring the unilateral reduction of all full-time Fleet and Passenger Service Employees to part-time positions, or any other reduction in wages rates or benefits for any IAM-represented employees prior to completion of the Railway Labor Act requirements;

E. Injunctive relief requiring United Airlines to make whole all IAM-represented employees adversely affected by its violations of contract and law;

F. Attorney's fees and costs of this litigation; and

G. Such other and further relief as this Court may find to be just and proper.

Dated: May 5, 2020

Respectfully submitted,

/s/ *John J. Grunert*
John J. Grunert, New York Bar No. 5124870
Jeffrey A. Bartos (*pro hac vice* to be filed)
Guerrieri, Bartos & Roma, P.C.
1900 M Street, NW, Suite 700
Washington, DC 20036
(202) 624-7400
Fax: (202) 624-7420
jgrunert@geclaw.com
jbartos@geclaw.com

*Counsel for Plaintiffs*